*In re* HULBERT

Docket No. 120937. Submitted June 19, 1990, at Lansing. Decided
      December 17, 1990, at 9:35 A.M.

The Department of Social Services petitioned the Jackson County
Probate Court for termination of the parental rights of LuAnn
Hulbert Coolbaugh and Gary Coolbaugh in their son, Robert
Hulbert, on the basis of neglect. Following the requisite hear-
ings, the court, Susan E. Vander Cook, J., ordered termination.
The respondents appealed.

The Court of Appeals *held:*

The probate court erred in finding sufficient evidence of
neglect to terminate the respondents' parental rights. Termina-
tion of parental rights requires clear and convincing evidence
of a failure and an inability to provide proper care and custody
of a child. The court's decision was based largely on the
speculative opinions of three DSS psychologists regarding what
might happen in the future, insufficient to warrant termination
under the clear and convincing standard.

Reversed and remanded.

*Joseph F. Filip,* Prosecuting Attorney, and *Jer-
rold Schrotenboer,* Chief Appellate Attorney, for
the Department of Social Services.

*Roger J. Gleeson,* for LuAnn Hulbert Coolbaugh
and Gary Coolbaugh.

Before: GRIFFIN, P.J., and SHEPHERD and DOCTO-
ROFF, JJ.

GRIFFIN, P.J. Respondents appeal as of right
from a probate court order terminating their pa-
rental rights in their son, Robert Hulbert. We
reverse.

On appeal, respondents contend that the trial
court's decision to terminate parental rights was

not supported by clear and convincing evidence of neglect. We agree.

On appeal from termination of parental rights proceedings, this Court reviews the probate court's findings of fact under a clearly erroneous standard. MCR 5.974(I); *In re Miller,* 182 Mich App 70, 81; 451 NW2d 576 (1990). A finding is clearly erroneous where, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989); *In re Cornet,* 422 Mich 274, 278; 373 NW2d 536 (1985).

In the present case, respondents' parental rights were terminated pursuant to MCL 712A.19b(3)(d); MSA 27.3178(598.19b)(3)(d):

> (3) The court may terminate the parental rights of a parent to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (d) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the age of the child.

After a thorough review of the record, we are left with a definite and firm conviction that the trial court erred in finding sufficient evidence to warrant termination. Specifically, we note that the only evidence of actual neglect in this case was the mother's stipulation that she failed to keep the child on an apnea monitor for the full time as advised by a doctor and failed to give the child a proper dosage of medicine. We cannot find any

evidence of past neglect attributable to the father, Gary Coolbaugh.

The trial court's subsequent decision to terminate the respondents' parental rights was based largely, if not exclusively, on the testimony of Gerald Pape, Russell Stambaugh, and John Hand, three psychologists retained by the Department of Social Services. These experts essentially opined that respondents' "borderline" mental conditions *may* render them unfit or "ineffective" parents.

The speculation by these witnesses included possible harm the respondents *might* inflict upon the child because of their alleged personality disorders. For example, Mr. Pape, after interviewing LuAnn Hulbert Coolbaugh and performing only two psychological tests, the Rorschach Test (ink blots) and the Early Memory Test, diagnosed her as having a "borderline personality disorder." From such a diagnosis, Mr. Pape concluded "that there's—*a real possibility* of neglect of physical and emotional needs in this case."

Similarly, although respondent Gary Coolbaugh had never abused the child, Mr. Stambaugh rendered an opinion that respondent's personality disorder *could* be harmful to the child because of Gary's unfounded sexual jealousy of his wife:

> *A.* By far the most serious of the diagnoses that I offered was that of Paranoid Schizophrenia, and Gary was extremely anxious about the psychological evaluation and for a major part of that evaluation I believe he was deeply out of touch with reality. He was most out of touch during the Rorschach Test, which is the most ambiguous stimulating of all the different things that I presented to him.
>
> * * *
>
> But when confronted with the ambiguity of the Rorschach responses, he came up with a very

idiosyncratic highly personalized response to the test where he answered them as if they were a test of his sexual adequacy or sexual knowledge when, in fact, that's not what the Rorschach Test is about at all. It's about asked —what you see in ink blots.

\* \* \*

*Q.* Okay. As long as we're talking about the Paranoid Personality Disorder, let's deal with that. How would that affect his ability to provide care and custody of a minor child?

*A.* Gary has a tremendous amount of difficulty forming stable relationships with other people because of his difficulties trusting them, and he has inner doubts about himself which he projects onto other people and he says, "These people don't like me." or "These people think I'm not sexually adequate." or "These people want to hurt me," when they don't really want to do that. He can't face his own inner questions about himself, and so he says, "You think that about me." rather than saying to himself, "I think that about myself and I need to do something about it." This leads him into tremendous disputes with other people.

The most significant ones with LuAnn had to do with issues of sexual jealousy and sometimes those weren't just paranoid projections, sometimes they were externalizations which means that LuAnn would in fact show interest in somebody else and there was somebody else there to really be concerned about. But he is the kind of person who would find himself in a situation with a partner who would be likely to take advantage of that or play off his sexual jealousy.

*Q.* How would—how would that affect his ability to care for a child? Can you give us some direction?

*A.* With his tremendous capacity for—if you remember, I said he got extremely out of touch with reality during the psychological evaluation because he was very anxious and very stressed. Well, believing that about LuAnn, getting in a fight about that with somebody else, he would

become very anxious and very stressed, and in such circumstances he could become grossly unrealistic. He could become assaultive. He could become argumentative. He could go back to his drinking, and if drinking, his controls would be further loosened and then would become even more dangerous.

So he's not the person who—with a capacity to decompensate is likely to stay out of trouble. You know, some people sort of avoid everybody else, don't get into hot situations where they're likely to become too troubled. Gary isn't that kind of guy. He's much more likely to get into the kinds of disputes that are most destabilizing for him.

*Q.* And this you feel would be harmful to the minor child?

*A.* I think it would be harmful to LuAnn, and I think it could be harmful to the child, either because Gary gets real angry because the child did something that really made him very angry or he gets angry at LuAnn; fights with LuAnn in a way that would be damaging to the child.

The lower court in its written opinion terminating the respondents' parental rights makes no reference whatsoever to respondents' Exhibit No. 2, which is a June 6, 1988, report from Gerald Rein of the DSS Family Resource Center. Mr. Rein, after observing the respondents' regular and weekly visits with their son, concluded with regard to respondent Gary Coolbaugh:

My observations are that Gary certainly helps LuAnn in providing for Bobby and never have I seen him act in an untoward or inappropriate manner.

As to LuAnn Hulbert Coolbaugh, Mr. Rein concluded:

As in the previous report, I believe that LuAnn

> wants to be a good mother. She is an immature
> dependent and often childlike adult *who at this
> time can adequately parent Bobby.* [Emphasis
> added.]

After giving all due deference to the trial court's evaluation of the evidence, we are firmly convinced that more is required under the statute to terminate respondents' parental rights than what appears on this record. The statute requires "clear and convincing evidence" of both a failure and an inability to provide proper care and custody. This record contains merely the speculative opinions of the psychologists regarding what *might* happen in the future. In short, given the minimal evidence of past neglect, we do not feel that the fact that respondents' mental conditions "might," "could," or are "likely to" result in neglect or abuse is clear and convincing evidence sufficient to warrant termination.

Accordingly, we reverse the order of termination and remand this matter to the probate court for reconsideration. In its sound discretion, the trial court may take additional testimony. In any event, prior to making an order of disposition, the trial court shall require the Department of Social Services to prepare a case-service plan pursuant to MCL 712A.18f(2)-(5); MSA 27.3178(598.18f)(2)-(5).

Reversed and remanded. We do not retain jurisdiction.