*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* S. K. JACKSON, Minor.

UNPUBLISHED
October 07, 2024
2:03 PM

No. 369304
Otsego Circuit Court
Family Division
LC No. 18-000016-NA

Before: BOONSTRA, P.J., and JANSEN and N. P. HOOD, JJ.

PER CURIAM.

Respondent-father[1] appeals by right the trial court's order terminating his parental rights to his minor child, SKJ, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (j) (reasonable likelihood child will be harmed if returned to the parent's home). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Respondent was incarcerated two months before SKJ was born in 2014, and he has remained incarcerated since that date. He became eligible for parole on his original offense in 2015, but in 2016 he pleaded guilty to possessing a weapon (while in prison), resulting in an additional sentence. In 2017, he assaulted a prison employee, and was sentenced in 2018 as a fourth-offense habitual offender, MCL 769.12, to a prison term of 20 months to 15 years for that offense.

Respondent's parental rights to SKJ were previously terminated in 2021, but this Court vacated that termination and remanded for further proceedings, finding that respondent's plea to jurisdiction had not been knowingly and voluntarily made. See *In re Jackson*, unpublished per

---

[1] The parental rights of SKJ's mother were terminated prior to the relevant proceedings in this case. She is not involved in this appeal. Consequently, we will hereafter refer to SKJ's father as "respondent."

curiam opinion of the Court of Appeals, issued February 24, 2022 (Docket No. 357089). On remand, the Department of Health and Human Services (DHHS or petitioner) filed a new petition requesting that the trial court take jurisdiction over SKJ. The petition alleged that respondent was incarcerated and could not provide SKJ with proper care. At the adjudication trial, a jury found sufficient justification for the trial court to take jurisdiction over SKJ. After the adjudication, respondent entered into a court-ordered parent-agency treatment plan that required him to address his "emotional stability," "parenting skills," "employment," "intellectual capacity and communication and personal skills."

On September 14, 2022, respondent was involved in a fight with other inmates and prison personnel, and he received four more prison misconducts: two counts of assault and battery against a prison staff member, one count of threatening behavior, and one count of fighting. Respondent was moved to a higher security (Level V) prison.[2] He was denied parole later that same month. Because of this incident and his new security level, respondent's ability to engage in services was reduced. On August 23, 2023, the trial court changed the permanency goal from reunification to termination. On September 29, 2023, petitioner filed a supplemental petition seeking termination of respondent's parental rights, describing the continuing unresolved barriers (lack of "appropriate housing, employment, mental stability, and rebuilding the parent child bond") that currently existed and would exist even after respondent was granted parole.

A two-day termination hearing was held on November 17 and 21, 2023. Respondent's caseworker testified that respondent would not be ready to parent SKJ upon his release from prison. The caseworker testified that respondent had participated in group and individual counseling while in prison, and had attended "family team meetings" and "team decision making meetings" to discuss the case progress; his behavior at those meetings was good. The caseworker concluded that respondent had shown "minimal benefits" from being provided services, although she acknowledged the role his incarceration played in hampering his ability to access services. The caseworker also testified that respondent's contact with SKJ had been "inconsistent." Respondent had never visited with SKJ in person, and he had only had two video calls with her in the last three years, although respondent and SKJ had also communicated by phone and letter. SKJ was in a stable foster placement and had expressed that she would like to stay in the home and not live with her father; her foster home was a "potential adoptive home."

Respondent testified that he was participating in a cognitive behavioral therapy program while incarcerated, and that he planned on either living with his grandmother or "a community placement most likely around Gaylord" when released. Respondent also testified that the parole

---

[2] The Michigan Department of Corrections (MDOC) assigns an initial custody level, based in part on "the length of the original sentence." Michigan Department of Corrections, *Overview of MDOC Facilities* <https://www.house.mi.gov/hfa/PDF/Corrections/Corrections_Subcmte_Testimony_C orrectional_Facilities_Overview_3-3-21.pdf> (accessed September 16, 2024), p 3. There are five custody levels (I, II, IV, V, and Administrative Segregation), with Level V being the second strictest. *Id*.

board would be making another decision regarding his parole eligibility soon and that he could possibly be released by December 2023.[3]

The trial court found that clear and convincing evidence established statutory grounds for termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*) and (j), noting that even if respondent were "released tomorrow," he would need significant time to establish housing, employment and transportation before the court could even consider releasing SKJ to his care. The trial court further found that termination served SKJ's best interests, noting the relative weakness of the bond between respondent and SKJ and SKJ's stability in her current placement. The trial court subsequently entered an order terminating respondent's parental rights. This appeal followed.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court erred by finding that statutory grounds to terminate his parental rights had been established. We disagree.

"[T]he petitioner for the termination of parental rights bears the burden of proving at least one ground for termination." *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). "This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). A trial court's factual finding is clearly erroneous if although there is evidence to support it, the Court is definitely and firmly convinced that the trial court made a mistake. *Id*. at 709-710. "[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). "Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

MCL 712A.19b(3)(c)(*i*) and (j) provide in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

---

[3] MDOC's Offender Tracking Information System (OTIS) indicates that respondent is still incarcerated as of September 2024. See https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=826187> (accessed September 16, 2024).

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.[4]

"The mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination." *In re Mason*, 486 Mich 142, 160; 782 NW2d 747 (2010). "The state is not relieved of its duties to engage an absent parent merely because that parent is incarcerated." *Id*. at 152. Additionally, if a respondent was "not afforded a meaningful and adequate opportunity to participate[,] . . . termination of his parental rights was premature." *Id*.

Termination pursuant to MCL 712A.19b(3)(c)(*i*) is appropriate even when a parent "embarked on a commendable effort to" remedy his or her conditions, if "the totality of the evidence amply supports that [the parent] had not accomplished any meaningful change in the conditions existing by the time of the adjudication." *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). Even if a respondent has participated in all the services offered, "mere participation is not the same as overcoming the barriers in place." *In re Sanborn*, 337 Mich App 252, 274; 976 NW2d 44 (2021).

The bases of the trial court's assumption of jurisdiction were respondent's incarceration and inability to provide for SKJ's emotional and physical needs when he was finally released. More than 500 days had passed between the initial dispositional order and the termination date. At the time of termination, respondent was not only still incarcerated, but had committed additional assaultive crimes while in prison, which led to his being denied parole. This behavior also limited his access to services and his ability to fully prepare himself to care for SKJ after incarceration by causing his move to a more secure facility and loss of privileges.

Respondent argues that the trial court should have postponed its termination decision until after the parole board had issued its decision regarding his most recent request for parole. We disagree. Parole was far from guaranteed, especially given respondent's history of denied paroles and extended sentences resulting from new incidents; in fact, as noted, respondent was *not* granted parole in November or December 2023. Moreover, the trial court explicitly did not base its analysis, on the assumption that respondent's parole would be denied. Instead, the trial court described how respondent had not addressed his inability to provide proper care for SKJ, even if he was released in the near future. The trial court's specifically posed the optimistic hypothetical of respondent's release on the very next day, and found that even in that situation, respondent

---

[4] This version of MCL 712A.19b(3)(j) was in effect at the time the trial court issued its order in this case. MCL 712A.19b(3)(j) was amended effective February 13, 2024, to replace "he or she" with "the child." See 2023 PA 295.

would be far from ready to provide care for SKJ. Respondent's failure to rectify the conditions that led to adjudication, despite the lengthy period of the overall case, demonstrates that there was no reasonable likelihood that respondent would rectify the conditions in a reasonable amount of additional time. *Williams*, 286 Mich App at 272.

The trial court's finding of a reasonable likelihood that SKJ would be harmed if placed in respondent's care was also supported by the evidence. The caseworker testified that she was concerned about whether respondent-father would be able to provide for SKJ's "medical, mental and financial well-being." She testified that uncertainty about respondent's housing and emotional stability created "a safety issue." She further testified that respondent-father was "virtually a stranger" and lacked a parental bond with SKJ, which made her concerned about SKJ's mental health if she were to live with respondent-father. Respondent had been incarcerated for SKJ's entire life, and had never been responsible for parenting SKJ. Moreover, the record shows that SKJ had expressed that she did not wish to live with respondent. The trial court found that SKJ would suffer emotionally by being taken from her current environment and placed in respondent's care. "The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm." *Sanborn*, 337 Mich App at 279.

The trial court did not clearly err by determining that MCL 712A.19b(c)(*i*) and (j) were satisfied. *White*, 303 Mich App at 709.

### III. BEST-INTEREST DETERMINATION

Respondent also argues that the trial court erred by finding that termination of his parental rights was in SKJ's best interests. We disagree.

After a statutory ground for termination has been proven, the trial court must also find that termination is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012); see also MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The trial court should weigh all of the available evidence in making a best-interest determination. *White*, 303 Mich App at 713. This Court reviews the trial court's determination regarding the children's best interests for clear error. *Id*. "[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

Respondent argues that the trial court erred by considering the relative advantages of SKJ's foster placement in making its best-interest determination. We disagree. Respondent is correct that *statutory grounds for termination* may not be found merely because the child would be "better off" in foster care. See *Fritts v Krugh*, 354 Mich 97, 115; 92 NW2d 604 (1958), overruled on other grounds by *In re Hatcher*, 443 Mich 426, 444; 505 NW2d 834 (1993); *In re Foster*, 285 Mich App 630, 635; 776 NW2d 415 (2009); *In re Hamlet*, 225 Mich App 505, 523; 571 NW2d 750 (1997). But consideration of the "advantages of a foster home" is "appropriate in a best-interests determination." *Foster*, 285 Mich App at 635.

In this case, respondent's caseworker testified about the lack of engagement in SKJ's life that had resulted from respondent's continuing incarceration (that had been significantly

lengthened by his commission of new crimes and misconduct in prison). She testified that SKJ had displayed "worrying" levels of anxiety concerning living with respondent, someone she had never met in person. In contrast, the caseworker testified that SKJ's foster family was stable and wished to adopt her. She testified that SKJ had a bond with her foster family, had a "significant bond with her counselor," and had many friends in her community; SKJ attended a church camp, attended gymnastics, and was enrolled in "a school that she is very familiar with and has attended for several years." Her foster parents were "the parents of her best friend that she has had since she began school." SKJ was "very happy, she's very content." SKJ had stated that she wished to stay in the foster home and that she did not want to live with respondent. By contrast, respondent described only vague plans to obtain housing and a job upon release from prison. On this record, the trial court did not clearly err by finding that termination was in SKJ's best interests. *White*, 303 Mich App at 713.

Affirmed.


/s/ Mark T. Boonstra
/s/ Kathleen Jansen
/s/ Noah P. Hood